978 F.2d 126
 121 A.L.R.Fed. 745
 Randall QUINN; Marianne Merritt, Appellants,
v.
Michael P.W. STONE, Secretary of the Army, Letterkenny Army
Depot; Captain Beth Muench; Lieutenant George
Statler; Investigator Robert Fox;
Investigator David Miller;
the Department of the Army.
 No. 91-5806.
 United States Court of Appeals,
Third Circuit.
 Argued May 4, 1992.
Decided Nov. 4, 1992.
Sur Petition for Panel Rehearing with
Suggestion for Rehearing In Banc
Jan. 6, 1993.
 
 Arthur T. McDermott (argued), Carlisle, Pa., for appellants.
 Michael J. Kane (argued), Office of U.S. Atty., Harrisburg, Pa., for appellees.
 Before: BECKER, NYGAARD and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 
 1
 In 1723, England responded to an upsurge of poaching by passing the Black Act, prescribing the death penalty for those who, in any of the King's forests, "unlawfully and wilfully hunt, wound, kill, destroy, or steal any red or fallow deer."[1] Even for its time, such a penalty was harsh, but the hunting of deer was a matter of vital economic concern for that agrarian society. While deer-hunting is no longer punishable by death and is indeed now seen more as a sport than as a livelihood, the issues presented by this appeal touch upon a concern which is considered equally vital by our present-day society: privacy. By improperly disclosing information about a pair of deer hunters, information that was protected by the Privacy Act, government employees here may have impermissibly intruded into the private space of the appellants. In reversing the district court's grant of summary judgment for the appellees and remanding the case, we will consider several issues concerning the scope of the Privacy Act and the requirements for maintaining a suit for damages under its provisions. Because of the labyrinth of the Privacy Act, we must write extensively to demonstrate why there are some genuine material facts which may be in dispute and which thus preclude the granting of summary judgment on some issues.
 
 I. Facts and Procedural History
 
 2
 Appellants Randall Quinn (Quinn) and Marianne Merritt (Merritt) are married to each other and work at the Letterkenny Army Depot (LEAD) in Chambersburg, Pennsylvania as civilian employees. Appellee Michael P.W. Stone is the Secretary of the Army[2] and the second appellee is the Department of the Army.[3] At LEAD, Quinn is a natural resource manager and Merritt is an environmentalist. Quinn is responsible for controlling the deer population on LEAD property by setting the length of the hunting season and determining the types of deer to be killed.
 
 
 3
 In the fall of 1989, Quinn investigated the possibility of contracting LEAD game law enforcement duties to the Pennsylvania Game Commission (PGC). If realized, this plan would have reduced the number of overtime hours worked by Security employees at LEAD. Quinn's proposal was apparently never implemented. Additionally, Quinn decided that the length of the 1989-90 deer hunting season on LEAD property should be extended in order to reduce the deer population which was above the recommended level. For similar wildlife management reasons, Quinn also decided that piebald ("white") deer, previously off-limits to hunters, should be killed that year. Captain Beth Muench, in charge of security at LEAD, opposed the extension of the hunting season, citing logistical and staffing problems that the extension would create. Lieutenant George Statler (Statler), the LEAD Hunting and Fishing Coordinator, who worked in the Security Division, also opposed the extension of the season and the killing of the piebald deer. According to appellants, these work-related disputes provided the impetus for the subsequent alleged disclosures of information by members of the Security Division at LEAD.
 
 
 4
 In addition to their professional interest in LEAD's wildlife, Quinn and Merritt are both deer hunters and hunt deer on LEAD property with other hunters. Quinn and Merritt are registered with the Pennsylvania Game Commission and possess valid Pennsylvania hunting licenses. Quinn and Merritt also have "bonus tags" which allow the holder to kill one additional deer during the hunting season. Both also possess valid LEAD hunting permits.
 
 
 5
 On January 6, 1990, Quinn and Merritt went hunting on LEAD property. At check-in Post 2, both Quinn and Merritt complied with the LEAD procedures whereby all hunters are required to produce their Pennsylvania hunting licenses and LEAD hunting permits. As part of this check-in procedure, the LEAD Security employees annotate a computer-generated hunting roster, which lists all hunters with LEAD hunting permits. Each entry on this roster corresponds to a single hunter and consists of:
 
 
 6
 a. the LEAD permit number
 
 
 7
 b. the Pennsylvania hunting license number
 
 
 8
 c. the name of the hunter
 
 
 9
 d. the address of the hunter
 
 
 10
 e. the phone number of the hunter.[4]
 
 
 11
 The hunting roster is computer-generated at the beginning of the hunting day, with the check-in time, check-out time, and kill information added by hand as the day progresses.
 
 
 12
 The computer-generated LEAD hunting roster for January 6, 1990 incorrectly gave separate addresses and phone numbers for Quinn and Merritt. The roster indicated that Quinn lived at an address in St. Thomas, Pennsylvania and Merritt in Chambersburg, Pennsylvania. Both parties agree that Merritt's listed address was incorrect and out-of-date. Apparently, her prior address was never changed in the LEAD files, even though Merritt had written her new address on her LEAD hunting permit application, her LEAD hunting license, her application for a Pennsylvania hunting license, and her Pennsylvania hunting license for the 1988-89 and 1989-90 hunting seasons.
 
 
 13
 Two of Security personnel conducting the check-in at Post 2 during the day were Lark Myers (Myers) and Statler. Statler personally observed Quinn and Merritt checking in to hunt. Shortly after Quinn and Merritt checked in, Myers mentioned to Statler that Quinn had previously brought a deer to Myers' fiance's butcher shop to be butchered. Statler questioned how Quinn could still be hunting this season if he had already killed one deer. Statler reviewed the roster and found Quinn's name. Statler then looked for Quinn's wife's name but did not recognize Merritt's name. He then asked Myers what Quinn's wife's name was and Myers told him that she thought Merritt continued to go by the name of Merritt after her marriage to Quinn. Statler again reviewed the hunting roster and found Merritt's entry. Statler noted that the home address listed for Merritt was different from that listed for Quinn and remarked on this to Myers.
 
 
 14
 Later that morning, Statler reported to David Miller (Miller), an investigator in LEAD Security, the information that Quinn and Merritt were hunting and that they had taken a deer to be butchered earlier during the hunting season. Miller then informed Jody Eyer (Eyer), a part-time Deputy Wildlife Conservation Officer with the Pennsylvania Game Commission, of Quinn's and Merritt's hunting even though Quinn had previously killed a deer that season. Eyer believed that there were grounds to suspect that a hunting violation had occurred since a hunter is generally allowed to kill only one deer a season. Eyer contacted Statler and spoke with him directly. He also reviewed the hunting roster. Eyer turned the case over to Frank Clark (Clark), a full-time PGC Wildlife Conservation Officer, for investigation, although Eyer continued to aid in the investigation.
 
 
 15
 On January 9, 1990, LEAD's Miller met with PGC's Clark. In this meeting, Clark reviewed the hunting roster generated at Post 2 and noted the discrepancies between Quinn's and Merritt's listed addresses. To Clark, the two addresses raised the possibility that Quinn and Merritt "had used two addresses to illegally obtain two sets of hunting licenses." At this meeting, Clark requested that LEAD review available files to determine the correct addresses. LEAD investigator Fox (Fox) did so but was unable to determine the correct addresses.
 
 
 16
 After the January 9, 1990 meeting, Clark checked the local telephone book. Quinn's address and telephone number were listed, but Merritt's home address was not listed. Clark thus contacted the agent (K-Mart) which had issued Merritt's Pennsylvania hunting license and obtained Merritt's hunting license application. Merritt had listed her address on this application as being the same as Quinn's. Clark thus concluded that there was no evidence that Quinn and Merritt had improperly used separate addresses to obtain two sets of hunting licenses.
 
 
 17
 Clark nevertheless continued his investigation and confirmed through interviews with witnesses at the butcher's shop that Quinn had brought a deer to the butcher's prior to hunting at LEAD. Clark then interviewed Quinn on February 28, 1990. Quinn told Clark that he and Merritt had obtained "bonus tags" for another Pennsylvania county and that Merritt had killed the deer that was brought to the butcher's in that other county. Clark asked to see the bonus tags to verify the story. Quinn agreed to show Clark the bonus tags which were at Quinn's home. Quinn arranged a later meeting and gave Clark the address of his house and directions there. On March 3, 1990, Clark went to Quinn's home where Quinn produced the valid bonus tags.
 
 
 18
 As we explain in more detail below, the parties dispute exactly when and how, but both agree that Clark received from LEAD Security at some point between Feb. 27, 1990 and March 5, 1990 information that indicated Merritt was in fact working on Dec. 11, 1989, the day that Merritt killed the first deer. It is not in dispute that on March 5, 1990, Fox went and obtained from Barbara Davis in LEAD's Finance and Accounting Office the information that Merritt's time card showed that she worked a full eight hours on Dec. 11, 1989. At a later point, Fox corrected the information Clark had initially received and told Clark that Merritt's supervisor had not properly completed the agency time cards and that Merritt was in fact not working on Dec. 11, 1989. Having determined there was no evidence to charge Quinn or Merritt with hunting violations, Clark closed his investigation.[5]
 
 
 19
 The appellants allege that both suffered occupational and health damage as a result of the disclosures. Quinn alleges that he suffered damage to his professional image, reputation, integrity and working relationship with LEAD and PGC personnel. Merritt alleges that her reputation for "law-abidingness and integrity" was damaged. Quinn also alleges suffering from stress, headaches, hypertension, chest pains, sinusitis, nervousness, and inability to sleep. Merritt alleges she suffered stress, nervousness, and inability to sleep. Both allege they suffered emotional anguish.
 
 
 20
 Quinn and Merritt filed separate actions alleging violations of the Privacy Act, 5 U.S.C. § 552a, and seeking an order directing the Army to purge its files of records relating to the plaintiffs and damages for violations of the Act. The district court granted the defendants' motion to consolidate the actions and on September 18, 1991 granted the defendants' motion for summary judgment. Plaintiffs filed a timely appeal. Subject matter jurisdiction is based on 5 U.S.C. § 552a(g). We have appellate jurisdiction under 28 U.S.C. § 1291.
 
 
 21
 In reviewing a grant of summary judgment, we apply the same standard the district court should have used initially. Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir.1987). We must reverse unless it is plain that no genuine issue as to a material fact remains for trial and that the moving party is entitled to summary judgment as a matter of law. Id.
 
 II. The Privacy Act
 
 22
 This appeal presents several different issues relating to three of the four necessary elements for a damages suit under the Privacy Act.[6] As we explain in this opinion, in order to maintain a suit for damages under the catch-all provision of 5 U.S.C. § 552a(g)(1)(D) for a violation of the Act's central prohibition against disclosure, § 552a(b), a plaintiff must advance evidence to support a jury's finding of four necessary elements: (1) the information is covered by the Act as a "record" contained in a "system of records"; (2) the agency "disclose[d]" the information; (3) the disclosure had an "adverse effect" on the plaintiff (an element which separates itself into two components: (a) an adverse effect standing requirement and (b) a causal nexus between the disclosure and the adverse effect); and (4) the disclosure was "willful or intentional."
 
 
 23
 A. Was the Information Covered by the Act?
 
 
 24
 The appellees first argue that the district court properly granted summary judgment because the information relating to Merritt[7] on the LEAD hunting roster and on her time card is not information covered by the Act. We disagree.
 
 The Act defines a "record" to mean:
 
 25
 any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying particular assigned to the individual, such as a finger or voice print or a photograph.
 
 
 26
 5 U.S.C. § 552a(a)(4). Further, the Act's prohibition on disclosure relates to "any record which is contained in a system of records." § 552a(b).[8] Fitting the statutory definitions of a protected record, the information allegedly disclosed from both the hunting roster and the time card contained an identifying particular (the plaintiff's name) and was maintained within a system of records.
 
 
 27
 Appellees propose two separate arguments that the information contained in the hunting roster is not a "record" within the meaning of the Act. First, they argue that stale or incorrect information, such as Merritt's out-of-date address and telephone number, is not covered by the Act because this information is not meaningful. We cannot accept this argument in this case. The Third Circuit has recently re-affirmed that, at the very least, there is a "meaningful" privacy interest in home addresses. Federal Labor Relations Authority v. U.S. Department of the Navy, 966 F.2d 747, 756, 770-71 (3d Cir.1992) (in banc). As we noted there, the disclosure of home addresses "can identify specific and sometimes personal characteristics about residents." Id. at 772. In the light of the other information disclosed in this case, the disclosure of the existence of an out-of-date address, different from the one at which Merritt was currently living, revealed the meaningful information that Merritt had maintained an address apart from Quinn's, an address that might be used to manipulate Pennsylvania's hunting laws. As this case demonstrates, the meaningful privacy interest in a particular piece of information may be lessened by the passage of time, but such an interest is unlikely to be extinguished. We conclude that this out-of-date home address was meaningful information and was protected by the Privacy Act.
 
 
 28
 Second, the appellees argue that the Act protects only information which discloses a characteristic or quality of an individual. The appellees contend that Merritt's information on the hunting roster did not constitute a "record" because "none of the information disclosed a characteristic or quality about her." Applying this argument also to the time card, appellees argue that "[t]he fact that an individual was working or not on a weekday is not information which discloses a characteristic [or] quality about the person."
 
 
 29
 At first blush, this argument seems close to the requirement that the information must be meaningful, but appellees here propose a different gloss on the statute than that of meaningfulness. They would read the Act to protect only that category of information which is intimate or personal, information which directly reflects a specific or personal characteristic about a person (as opposed to information which might reveal such specific and personal characteristics but only in conjunction with other pieces of information). Appellees' position is supported by some district court decisions which have denied Privacy Act protection to this type of information.[9] Windsor v. Federal Executive Agency, 614 F.Supp. 1255 (M.D.Tenn.1983), aff'd, 767 F.2d 923 (6th Cir.1985); American Federation of Government Employees v. National Aeronautics and Space Administration, 482 F.Supp. 281 (S.D.Tex.1980) (AFGE ) (information about daily hours worked on a sign-in/sign-out time sheet not covered by the Act); Houston v. U.S. Department of the Treasury, 494 F.Supp. 24 (D.D.C.1979).
 
 
 30
 While we agree that the information contained in the time card in this case is very similar to the information at issue in AFGE, we think that such information does reveal a "quality or characteristic" about that person. Time card information regarding taking time off from work as compensation for overtime, as sick leave, or for vacation can easily be considered descriptive of an individual.
 
 
 31
 More significantly, we reject appellees' underlying argument that the information covered by the Act as a "record" is limited to the information that directly reflects a characteristic or quality of the individual. First, we find such an interpretation contrary to the language of the statute. On its face, § 552a(a)(4)'s statutory definition of a record as "any item, collection, or grouping of information about an individual" appears to us to have a broad meaning encompassing any information about an individual that is linked to that individual through an identifying particular and is not to be restricted to information that reflects a characteristic or quality of an individual. Moreover, our interpretation is consistent with the thrust of the statutory definition. A "record" may be "any item, collection, or grouping of information about an individual." 5 U.S.C. § 552a(a)(4). While a record can therefore consist of a single piece of information, it may also be a collection or grouping of pieces of information. Thus, even if a piece of information could not meet a "characteristic or quality" test standing alone, it could still be included within a "record" as statutorily defined and protected by the Act if that piece of information were linked with an identifying particular (or was itself an identifying particular) and maintained within a system of records.[10]
 
 
 32
 Second, we note that interpreting the Act to cover only personal or sensitive information would be inconsistent with the Privacy Act Guidelines issued by the Office of Management and Budget (OMB). Privacy Act Guidelines (July 1, 1975), 40 Fed.Reg. 28949. The OMB Guidelines are designed to assist other agencies in implementing the Privacy Act.[11] The OMB Guidelines are due the deference accorded to the interpretation of an agency charged with "oversight" of implementation. Perry v. F.B.I., 759 F.2d 1271, 1276 n. 7 (7th Cir.1985), en banc, 781 F.2d 1294, cert. denied, 479 U.S. 814, 107 S.Ct. 67, 93 L.Ed.2d 25 (1986); see also Cuccaro v. Secretary of Labor, 770 F.2d 355, 360 (3d Cir.1985). According to the OMB Guidelines, a record means "any item of information about an individual that includes an individual identifier." 40 Fed.Reg. 28,951 (emphasis added). A record "can include as little as one descriptive item about an individual." 40 Fed.Reg. 28,952 (quoting legislative history). The Guidelines thus confirm our statutory reading that the information covered by the Act should not be limited to information which taken alone directly reflects a characteristic or quality.
 
 
 33
 We thus reject the cases cited by the appellees, none of which of course are binding on this panel, and conclude in this case that both the information on the hunting roster and time card was information that was covered by the Act.
 
 
 34
 B. Did the agency "disclose" the information?
 
 
 35
 Even if the information on the hunting roster and on the time card were covered by the Act, appellees make two arguments that this information was not "disclosed" within the meaning of 552a(b).[12] The appellees contend that, while Quinn's home address and telephone number were records, they were not disclosed within the meaning of 5 U.S.C. § 552a(b) because the information had been previously disclosed by Quinn to the Pennsylvania Game Commission. Appellees argue that disclosure contemplates release of information not otherwise known to the recipient.
 
 
 36
 We agree the Act is not violated where the agency makes available information which is already known by the recipient. Kline v. Department of Health and Human Services, 927 F.2d 522 (10th Cir.1991); Hollis v. U.S. Department of the Army, 856 F.2d 1541 (D.C.Cir.1988); Pellerin v. Veterans Administration of U.S. Government, 790 F.2d 1553, 1556 (11th Cir.1986); see also Schowengerdt v. General Dynamics Corp., 823 F.2d 1328, 1341 (9th Cir.1987) (sending of a letter containing information about an individual to that individual not "disclosure").
 
 
 37
 There is no basis, however, in this record to make such an argument. Clearly, there was no prior knowledge of the information on the time card. Likewise, there is no evidence on this record that Eyer and Clark, the investigators in the field, already had any actual knowledge of the home address information. There is, by contrast, evidence that Eyer and Clark received the partially out-of-date information about Quinn's and Merritt's addresses by means of a disclosure of the hunting roster. Without evidence that Eyer and Clark otherwise knew the information disclosed, the appellees' argument fails.
 
 
 38
 The appellees next contend that no disclosure of information occurs when the information, even if not actually known by the recipient, is otherwise public.[13] Appellees may be making either of two arguments here. To say that information is public can mean either that such information is readily accessible to the members of the public or that each individual member of the public should be presumed to know this information. We reject both arguments.
 
 
 39
 Appellees have cited to this court no case that stands for the proposition that there is no violation of the Act if the information is merely readily accessible to the members of the public (such as in the local telephone book) and our research has discovered none. We doubt if any court would so hold. To do so would eviscerate the Act's central prohibition, the prohibition against disclosure. For instance, such an argument would short-circuit the delicate balancing courts now engage in between the FOIA and the Privacy Act under 5 U.S.C. § 552a(b)(2). See FLRA v. U.S. Department of the Navy, 966 F.2d 747, 756-61 (3d Cir.1992) (in banc). To define disclosure so narrowly as to exclude information that is readily accessible to the public would render superfluous the detailed statutory scheme of twelve exceptions to the prohibition on disclosure.[14] We conclude that making available information which is readily accessible to the members of the public is a disclosure under 552a(b), subject, of course, to the Act's exceptions.
 
 
 40
 Appellees' final argument has somewhat more support. Some courts have held that there is no disclosure within the terms of § 552a(b) where each individual member of the public should be presumed to know the information at issue. In Federal Deposit Insurance Corp. v. Dye, 642 F.2d 833 (5th Cir.1981), the court considered the potential violation of the Act by the disclosure of foreclosure sales of businesses in which the plaintiff had an interest. The information was published pursuant to state law in one county but was also published in an adjoining county. Id. at 834-35. The plaintiff alleged this extra publication violated the Act. While there was no showing that the information's recipients in the adjoining county had been "aware" of the defaults, the court found it "a compelling inference" that information became public in the adjoining county because the sales concerned businesses and businessmen of the adjoining county. Id. at 836. The court thus shifted the burden of proof to the plaintiff to show that the disclosures were not public information in the adjoining county. Since the plaintiff failed to meet this burden, the court remanded the case with instructions to enter summary judgment for the defendant. Id. at 837. Similar compelling inferences were present in Ash v. U.S., 608 F.2d 178, 179 (5th Cir.1979) (no disclosure where information of disciplinary proceedings open to the members of a Navy command was published to the personnel of the same command) and King v. Califano, 471 F.Supp. 180, 181 (D.D.C.1979) (record establishes that the information at issue was "publicly known" prior to disclosure).
 
 
 41
 Even if we were to adopt the approach of these cases, a question on which we express no opinion, the record in this case does not support a presumption that the public knew the information disclosed. Here, there is no compelling inference to be drawn that this information was known by the persons it was disclosed to. The addresses and telephone numbers of all persons listed in the local telephone book could not be presumed to be known by the public. Nor could the time card information disclosed by LEAD personnel to Clark be said to be publicly known.
 
 
 42
 We thus conclude that not only was the information contained in the hunting roster and the time card covered by the Act, but it was also disclosed within the Act's terms.
 
 
 43
 C. Are there disputed facts of "adverse effect"?
 
 
 44
 What remains is to examine the Act's "adverse effect" requirement. The Privacy Act's civil remedies section, in relevant part, provides as follows:
 
 
 45
 (g)(1) Civil remedies.--Whenever any agency
 
 
 46
 . . . . .
 
 
 47
 (D) fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual,
 
 
 48
 the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.
 
 
 49
 This section thus gives an individual adversely affected by any agency violation of the Act a judicial remedy whereby the individual may seek damages. Thus, there are two limitations placed on the right to sue. First, the adverse effect requirement of (g)(1)(D) is, in effect, a standing requirement.[15] Parks v. U.S. Internal Revenue Service, 618 F.2d 677, 682-83 (10th Cir.1980). Allegations of mental distress, emotional trauma, or embarrassment have been held sufficient to confer standing. Albright v. United States, 732 F.2d 181, 186 (D.C.Cir.1984); Parks, 618 F.2d at 683. Second, to state a claim under the Act, the plaintiff must also allege a causal connection between the agency violation and the adverse effect. Hewitt v. Grabicki, 794 F.2d 1373, 1379 (9th Cir.1986); Albright v. United States, 732 F.2d 181, 186 (D.C.Cir.1984); Edison v. Department of the Army, 672 F.2d 840, 845 (11th Cir.1982). As the Eleventh Circuit pointed out, this gives substance to the language of the Act requiring the agency to fail to comply "in such a way as to have an adverse effect." 5 U.S.C. § 552a(g)(1)(D).[16]
 
 
 50
 Appellees argue that neither of these two requirements were met in this case. First, they argue that Merritt makes no assertion that the release of time card information had an adverse effect on her sufficient to confer standing. Upon any fair reading of the record, however, appellees' argument cannot be sustained. As we have recounted above, both appellants allege that they have undergone stress and emotional anguish. Both also allege that they have suffered occupational losses due to the PGC investigation allegedly caused by the disclosures. We think these allegations sufficient to satisfy the Act's adverse effect standing requirement.
 
 
 51
 With greater vigor, appellees argue there is no causal connection between the disclosures and the adverse effects. They assert that the PGC's investigation was begun prior to and independent of the disclosure of the hunting roster. Appellees claim that the only information passed along to the PGC was Statler's personal observation that plaintiffs were hunting on Jan. 6, 1990 and Myers' observation that they had previously taken a deer to the butcher's. Defendants also claim that the time card disclosure had no causal connection to the adverse effects suffered by the plaintiffs.
 
 
 52
 We believe, however, that the record amply shows a causal connection between the disclosures and the alleged adverse effects on Quinn and Merritt by means of the PGC investigation. First, there is sufficient evidence for a jury to find that the PGC investigation was initially caused in significant part by the disclosure of the discrepant addresses. There is evidence that the varying addresses were passed along by LEAD Security employee Statler to Eyer of the PGC from the beginning of the investigation. At check-in Post 2, Statler had specifically asked about Quinn's wife, looked for her record, and noted that Quinn and she had different home addresses. Statler then reported to fellow LEAD Security employee Miller who in turn informed Eyer. Even if Statler and Miller did not jointly pass this information to Eyer in the first instance, a jury could certainly find that the disclosure occurred when Statler spoke directly with Eyer later that same day. It is a reasonable inference that a matter discovered and remarked upon by Statler would be immediately passed on by him to the investigating authorities. In any case, the record also shows that Eyer reviewed the roster directly.
 
 
 53
 Moreover, while Eyer was the first PGC employee to begin investigating, the investigation clearly became more serious when Eyer handed the process over to the full-time investigator, Clark. When that turnover occurred, Eyer had reviewed the roster. A trier of fact could infer that the address discrepancy was part of the impetus for Eyer to turn the investigation over to Clark, the full-time investigator.
 
 
 54
 We thus cannot agree with the district court that the difference in addresses which initially raised the suspicion of the PGC investigator was "only a small part of his investigation." This piece of information was present from the very beginning of the investigation and may have played a significant role in the crucial decisions to initiate and pursue the investigation.
 
 
 55
 Second, there is sufficient evidence for a jury to conclude that the disclosure of Merritt's time card information served to fuel and to keep the investigation going even after the discrepancy in the addresses had been resolved. This conclusion provides a causal link between the disclosure of the time card information and the adverse effects suffered as a result of the PGC investigation.
 
 
 56
 There are at least two different accounts inferable from the record of the point when Clark learned that Merritt's time card initially showed that she worked a full eight hours on the date that she claimed to have killed the first deer. According to Quinn, Clark knew this information before the March 3, 1990 meeting at his house.[17] According to Clark, he only learned of this information on March 5, 1990 when he contacted investigator Fox of LEAD Security after the March 3, 1990 interview with Quinn.[18]
 
 
 57
 Taking the allegations in favor of the party opposing summary judgment as true, as we must, a reasonable jury might conclude that the disclosure of this information before Clark went out to interview Quinn at his home served to keep the investigation going even after the discrepancy in Quinn's and Merritt's addresses had been resolved.[19] We think that the appellants have shown sufficient causation to survive a summary judgment motion on the issue of causation.
 
 D. Routine Use
 
 58
 The issue of the "routine use" exception[20] to the Act's prohibition on disclosure has been argued before this court by both parties. However, the issue was not argued before the district court in support of the defendants' motion for summary judgment and the district court did not consider the issue. We thus consider this issue waived for purposes of this appeal.
 
 
 59
 While appellees assert this issue as an alternative grounds for affirming the grant of summary judgment, we are reluctant to consider an issue not argued to and passed upon by the district court. On remand, the district court will be free to consider any further motion for summary judgment which may be presented to it, consistent with this opinion. See Krieger v. Ownership Corp., 270 F.2d 265, 273 (on petition for rehearing in banc) (3d Cir.1959) (per curiam).
 
 III. Purging of LEAD files
 
 60
 The district court also granted summary judgment to the appellees on the appellants' second claim for relief, the purging of files relating to the subsequent investigations, a claim brought under 5 U.S.C. § 552a(g)(2)(A) which allows a court to order the agency to amend an individual's record. We conclude that the district court correctly refused to order a purging of the files although we do not rest our holding on the grounds given by the district court, on which we express no opinion.[21]
 
 
 61
 We affirm the denial of this relief on the grounds that the plaintiffs have not exhausted their administrative remedies. The Act sets forth a detailed set of requirements whereby an agency must permit an individual to request amendment of a record pertaining to that individual, § 552a(d)(2), and must permit the individual to request a review of the agency's refusal to make such an amendment, § 552a(d)(3). In the event of a refusal after review, the agency must notify the individual of the individual's right to seek judicial review of the refusal. § 552a(d)(3). These provisions entail a requirement that the plaintiff exhaust her administrative remedies before she can take advantage of 5 U.S.C. § 552a(g)(2)(A).[22] See Dickson v. Office of Personnel Management, 828 F.2d 32, 4041 (D.C.Cir.1987). There is no indication in this record that Quinn or Merritt ever requested the Army to amend or expunge its records of this matter. We therefore hold that the district court correctly granted summary judgment to the appellees on this claim for relief.
 
 IV. Conclusion
 
 62
 We recognize that some persons might feel that a lengthy opinion such as this that explores whether or not it was permissible to reveal matters so mundane as information on a hunting record and a time card is a trivialization of the federal litigation process. However, Congress has made the choice that there are some areas of privacy which must be recognized by the federal government in its management of information and, as we read the present record, the appellants should not be precluded from proving their allegations. The district court's grant of summary judgment in favor of the appellees will be reversed in part and affirmed in part and the case remanded for further proceedings consistent with this opinion.
 
 
 63
 NYGAARD, Circuit Judge, dissenting.
 
 
 64
 While I agree with most of the conclusions reached by the majority, because I believe that the disclosure of the contents of these records was pursuant to a "routine use," I respectfully dissent.
 
 I.
 
 65
 The Privacy Act states that records are not protected from disclosure if the disclosure is pursuant to a "routine use." 5 U.S.C. § 552a(b)(3). A routine use is defined as "the use of such record for a purpose which is compatible with the purpose for which it was collected." 5 U.S.C. § 552a(a)(7). In addition, the Privacy Act states that the agencies must publish a notice each year in the Federal Register indicating the routine uses for which protected records may be used. 5 U.S.C. § 552a(e)(4). This information must include "the categories of users and the purpose of such use." 5 U.S.C. § 552a(e)(4)(D).
 
 
 66
 In compliance with the Privacy Act, the DOD published in the Federal Register, "blanket routine uses" which are applicable to every record system maintained by its various branches, including the army.
 
 
 67
 One of these provisions entitled "Routine Use--Law Enforcement," states:
 
 
 68
 In the event that a system of records maintained by this component to carry out its functions indicates a violation or potential violation of law ... the relevant records in the system of records may be referred, as a routine use, to the appropriate agency, whether federal, state, local, or foreign, charged with the responsibility of investigating or prosecuting such violation [.]
 
 Fed.Reg., May 29, 1985. (emphasis added.)
 
 69
 In addition, the DOD published the following in the Federal Register:
 
 
 70
 Information is furnished to the criminal justice elements outside the Department of Defense for investigation and prosecution when such cases fall within their jurisdiction or concurrent jurisdiction is applicable. These include ... state and local law enforcement ... [and] wildlife conservation ... agencies[.]
 
 
 71
 50 Fed.Reg. 22,161, May 29, 1985. (emphasis added.)
 
 A.
 
 72
 These routine uses fairly cover the facts of this case. The disclosure of the hunting roster information was for use by the Pennsylvania Game Commission's wildlife conservation officers to investigate possible violations of state hunting laws. This was precisely the type of "state law enforcement" the regulations covered.
 
 
 73
 Our decision in Britt v. Naval Investigation Service, 886 F.2d 544 (3d Cir.1989) supports the conclusion that the roster information was disclosed for a proper routine use. In Britt we emphasized that the Privacy Act's definition of routine use was the use of such record "for a purpose which is compatible with the purpose for which it was collected." We said this definition required us to make a dual inquiry into (1) the purpose for the collection and the specific case, and (2) the purpose of the disclosure. Britt, 886 F.2d at 549. Here, one of the main purposes for the collection of the information on the hunting roster was to monitor hunting in order to prevent unlawful overkilling of deer. The disclosure was made to help PGC find out if appellants were trying to hunt deer lawfully. I conclude that the disclosure was made for the reason for which the record was collected, and Britt 's routine use test is satisfied.
 
 B.
 
 74
 The disclosure of Merritt's time card information to PGC investigator Clark creates a tougher question. If based solely on the Federal Register routine use regulations, we would be able to conclude easily that the disclosure was proper. Here, as the regulations require, "a system of records ... indicate[d] a violation" and it was for this reason that "the relevant records were referred ... to the appropriate [state] agency" responsible for the investigation.
 
 
 75
 The problem arises from Britt 's holding--and, indeed, from the language of the Privacy Act itself; that the disclosure of the records must be for a use that is compatible with the original purpose for which the records were collected. In general, the main reason time cards are collected is to determine employees' work hours in order to compute payroll. It is not to collect information about an employee which can be used against him in a criminal investigation.
 
 
 76
 Nonetheless, the main purpose for which time cards are collected certainly is not the only purpose. One of the reasons time card information is collected is to find out if an employee was at work on a given day--the precise reason for which it was used in this case. LEAD disclosed information on Merritt's time card precisely for this purpose.
 
 
 77
 In addition, work schedule information about an employee typically would be useful for investigations that require knowing the employee's whereabouts on the day the employee claimed to be not working. If an investigator legitimately suspects an employee may have tried to deceive the government about not being at work on a given day, the government would disclose time card information that would help determine whether indeed the employee lied. Hence, even if the time record was not specifically collected for crime prevention or investigation, I believe it is available as evidence in a legitimate criminal investigation, because the disclosure is being made for a reason compatible with that for which it was originally collected--as evidence of whether and when she worked. To hold otherwise could potentially bar valuable federal agency information or facts about a person from being used as evidence by non-agency criminal investigators unless crime prevention was the main purpose for collecting the information in the first place.
 
 II.
 
 78
 For this reason, I would affirm the district court's grant of summary judgment as to both Merritt's time card and the hunting roster.
 
 
 79
 Present: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS, Circuit Judges and HIGGINBOTHAM, Senior Circuit Judge.*
 
 SUR PETITION FOR PANEL
 REHEARING WITH SUGGESTION
 FOR REHEARING IN BANC
 
 80
 Jan. 6, 1993.
 
 
 81
 The petition for rehearing filed by Appellees, having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges in active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is DENIED.
 
 
 
 [1]
 E.P. Thompson, Whigs and Hunters 271 (1975)
 
 
 [2]
 For purposes of this appeal, we assume that Secretary Stone is a proper defendant here. However, we express no opinion on whether the head of an agency is a proper defendant in a Privacy Act action. See Hewitt v. Grabicki, 794 F.2d 1373, 1377 (9th Cir.1986)
 
 
 [3]
 Four individually named defendants (Lieutenant George Statler, Investigator Robert Fox, Investigator David Miller, and Captain Beth Muench) and the Letterkenny Army Depot were dismissed from this action by the district court when the Department of the Army was added as a named defendant
 
 
 [4]
 The roster also has information for some of the entries under the categories of "DOE #" and "SPNSR". The record does not reveal what information is collected under these categories. We do not believe that these categories are relevant in this case
 
 
 [5]
 After the PGC's investigation was closed, LEAD Security began its own investigation into the leave discrepancies relating to Merritt's time cards. This investigation eventually disclosed that, rather than following established procedures, Merritt's department at LEAD operated on an honor system regarding compensatory time. Fox also referred the matter to the Army Criminal Investigation Division on March 6, 1990
 
 
 [6]
 We note that the district court did not discuss one of the necessary elements of a damages action under the Act, the knowledge element. To recover damages, a plaintiff must show that the agency acted in a manner which was intentional or willful. 5 U.S.C. § 552a(g)(4); see Britt v. Naval Investigative Service, 886 F.2d 544, 551 (3d Cir.1989). While appellees recognize that this is a necessary element of a Privacy Act suit for damages, they advance no argument on this point. We consider this issue waived. In any event, we think the conduct alleged in this case would meet (g)(4)'s standard
 
 
 [7]
 Defendants concede that Quinn's address and telephone number constitute a "record" within the meaning of the Act
 
 
 [8]
 The Act defines a "system of records" to mean:
 a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual.
 5 U.S.C. § 552a(a)(5). Appellees admit for purposes of this appeal that the roster is contained with a system of records, accessible by the name of the individual.
 
 
 [9]
 The single Court of Appeals case cited by the appellees provides only weak support for their position. While the Eleventh Circuit did use this "quality or characteristic" analysis in its opinion in Boyd v. Secretary of the Navy, 709 F.2d 684, 686 (11th Cir.1983), that court did not deny the Privacy Act's protection to the information at issue on this basis and specifically found that the memorandum in question in that case was a record within the meaning of the Act. Id
 
 
 [10]
 For example, in this case, the information about Merritt's check-out time on January 6, 1990 would not directly reflect a characteristic or quality of Merritt. Yet, by placing this information in the entry on the hunting roster, that information is made part of a record in a system of records that is clearly statutorily protected
 
 
 [11]
 The guidelines are authorized by § 6 of the Act, Pub.L. No. 93-579, 88 Stat. 1896, 1909 (1974). In this case, the regulations of the agency implementing the Privacy Act, the Department of Defense, merely track the language of the statute. See 32 C.F.R. § 286a.3 (1991) (Department of Defense Privacy Program)
 
 
 [12]
 The Act provides:
 No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless ...
 5 U.S.C. § 552a(b). The report accompanying the House version of what became the Privacy Act called the no disclosure without consent requirement "one of the most important, if not the most important, provisions of the bill." H.R.Rep. No. 1416, 93rd Cong., 2d Sess., at 12 (1974).
 
 
 [13]
 The appellees press this argument only with respect to Quinn, since Merritt's address and telephone number were not listed in the local telephone directory
 
 
 [14]
 5 U.S.C. § 552a(b)(1)-(12) (West 1977 & 1992)
 
 
 [15]
 The adverse effect that a plaintiff must show within the meaning of (g)(1)(D) is not necessarily equivalent to "actual damages" recoverable under (g)(4)(A). See Dickson v. Office of Personnel Management, 828 F.2d 32, 37 (D.C.Cir.1987) (interpreting similar term "a determination is made which is adverse to the individual" in (g)(1)(C))
 
 
 [16]
 Subsection (g)(1)(C) also uses language implying a causal connection. Edison, 672 F.2d at 845
 
 
 [17]
 According to Quinn, Clark said "Now I'm going to drop the bombshell. How could your wife have shot the deer on December 11 when her time card shows her as being at work?" Quinn responded that Merritt had used "comp time" that may have shown up as regular time on the card
 Quinn also alleges that Clark told Merritt that LEAD provided him with the time card information before the March 3, 1990 meeting.
 
 
 [18]
 Because they are apparently mutually inconsistent, we also note that there are two different versions of exactly when Quinn told Clark the date that Merritt shot the first deer, May 11, 1989
 According to Clark, Quinn told him of the date of the killing when Clark went to Quinn's house, that is March 3, 1990. This is consistent with the version of the other participant in the meeting, Quinn, who alleges that, on March 3, 1990, he presented Clark with the bonus tags and with "the other information [Clark] requested," including the information that Merritt had used comp time on May 11, 1989. However, a summary of investigative activity prepared by Fox, a LEAD investigator, is at odds with the account of Clark and Quinn. According to this summary, it was at the Feb. 27, 1990 meeting on LEAD property that "Quinn ... told Clark his wife had [twelve] hours of comp time and that she utilized comp time to hunt on 11 Dec 89." The summary then adds that at the March 3, 1990 meeting "Merritt related the deer was killed at 0725 hours, 11 Dec 89."
 
 
 [19]
 Indeed, the same inference, that the disclosure served to prolong the investigation, exists even on Clark's version of the timing. It was not until "several days" after the initial disclosure that Fox told Clark that Merritt's supervisor had been lax in completing agency time cards and had not properly recorded Merritt as being on leave from work on December 11, 1989. At that point, Clark determined there was no evidence to charge Quinn or Merritt with any hunting violations and the investigation was closed
 
 
 [20]
 See e.g., FLRA v. U.S. Department of the Navy, 966 F.2d 747, 761-65 (3d Cir.1992) (in banc); Britt v. Naval Investigative Service, 886 F.2d 544 (3d Cir.1989)
 
 
 [21]
 The district court reasoned that the dispute was non-existent and that the information was not covered by the Act since it was not retrievable by name
 
 
 [22]
 By contrast, there is no exhaustion requirement in a suit for damages under § 552a(g)(4). Nagel v. U.S. Department of Health, Education, and Welfare, 725 F.2d 1438, 1441 n. 2 (D.C.Cir.1984)
 
 
 *
 As to panel rehearing only