# United States Court of Appeals
## For the First Circuit

No. 02-1306

SUNDAY DIXON OREKOYA,
Plaintiff, Appellant,

v.

JAMES MOONEY; UNITED STATES SECRET SERVICE,
Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Morris E. Lasker,[*] Senior U.S. District Judge]

Before

Lynch, Circuit Judge,
Campbell, Senior Circuit Judge,
and Howard, Circuit Judge.

Gordon M. Jones, III with whom Robert P. Sherman, Hutchins, Wheeler & Dittmar, John Reinstein, and ACLU of Massachusetts were on brief, for appellant.

Barbara Healy Smith, Assistant U.S. Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellees.

May 15, 2003

---

[*] Of the Southern District of New York, sitting by designation.

**LYNCH**, **Circuit Judge**.  Sunday Dixon Orekoya is a black Nigerian national who brought suit asserting he was the victim of racial and national origin discrimination by an overzealous United States Secret Service agent who was investigating financial fraud crimes by Nigerian nationals.  Orekoya asserted that this agent and another violated the Privacy Act of 1974, 5 U.S.C. § 552a (2000), in two instances.  In 1989, Agent Melissa Walsh obtained and then released to Orekoya's employer, the Bank of New England, information about Orekoya (which turned out to be inaccurate) from the files of the Immigration and Naturalization Service.  In 1990, Agent James Mooney is alleged to have released to the employer information from a Federal Bureau of Investigation record.  Orekoya also asserts that Agent Mooney, through these and other actions, violated his Fifth Amendment rights.

The district court dismissed his Privacy Act claims after a bench trial.  A jury had earlier rejected his claims under 42 U.S.C. § 1981 (2000).  In this appeal, Orekoya argues that the jury was not properly instructed on his Fifth Amendment claims of discrimination, brought under the Bivens doctrine.  See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971).  He also attacks the district court's Privacy Act conclusions, claiming errors of fact and law.  On the Bivens jury instruction claim, we affirm.  On the Privacy Act claims, we affirm, holding that:  (1) the Act permits an award of emotional

distress damages, subject to firm requirements for proof of emotional distress; (2) plaintiff's proof of emotional distress damages was insufficient; and (3) an agency may not immunize itself from liability for its unauthorized disclosure on the grounds that the records disclosed did not come from its files but were obtained from a system of records maintained by another agency.

## I.  Background

A.  <u>Factual Background</u>

Orekoya was born in Lagos, Nigeria in 1960 and came to the United States to attend college in 1983.  He attended Roxbury Community College and took courses at Northeastern University and the New England Banking Institute.  In 1986, Orekoya began working for the Bank of New England (BNE) as a teller.  In 1988, he was promoted to a position as a Fund Accountant in the commercial lending department and transferred to BNE's headquarters.

In 1989, the United States Secret Service (USSS) and other federal agencies set up task forces in a number of cities to combat a rise in crime by Nigerian nationals.  The Immigration and Naturalization Service (INS) estimated that a majority of the Nigerian nationals in the United States were involved in criminal activity.  This activity revolved primarily around financial transaction and insurance fraud, and a typical suspect worked in a bank.

1.  <u>James Mooney</u>

On January 31, 1989, Orekoya loaned his car to Isaac Olopade, another Nigerian national. Olopade was stopped by the Providence Police for speeding. He was the subject of a USSS credit card investigation, and so the police called the Providence office of the USSS to request an agent's presence at the scene of the traffic stop. James Mooney, an agent specializing in counterfeiting and fraud investigations who knew Olopade, arrived. He discovered that the car belonged to "Sunday Dixon." This name was not unfamiliar to Mooney; a car with a license plate registered in that name had previously appeared at businesses subject to investigation and surveillance by the USSS.

In March 1990, Mooney was contacted by the Rhode Island police, who were investigating an allegation that Orekoya had raped a woman in Cranston. The woman named "Sunday Dixon" as the rapist and identified Orekoya's photo. Mooney discovered through the owner of the apartment where the rape occurred that Orekoya worked for BNE. Mooney then contacted BNE and discussed Orekoya with Christopher Carney, Director of Corporate Security for BNE. Mooney informed Carney that the USSS was conducting an investigation into the use of BNE credit cards in a fraud scheme involving stolen rental cars. Orekoya later claimed that Mooney also told Carney about the rape investigation and Orekoya's prior arrest for robbery, information supposedly derived from the Federal Bureau of

Investigation (FBI), and that Mooney asked for information about Orekoya's bank accounts.

On March 9, 1990, Orekoya was arrested at BNE by the Boston Police. Mooney interrogated him about the sexual assault and the involvement of Nigerians in credit card fraud. He also took a picture of Orekoya at the police station and kept it. Orekoya claimed that Mooney periodically showed the picture around the USSS office.

As a result of his arrest, Orekoya was suspended from work without pay. On June 25, 1991, the rape case was dismissed because the victim would not testify in court. That month Orekoya attempted to regain his job but was told that the position had been eliminated.

2. <u>Melissa Walsh</u>

In 1989, BNE began conducting an internal investigation into overdraft activity in Orekoya's personal bank account. In the course of the investigation, Carney noticed that Orekoya's passport had expired. On June 27, 1989, Carney contacted the USSS and asked Melissa Walsh, an agent, about Orekoya's immigration status. She called Carney back the next day and reported that she learned from "Immigration" that Orekoya was present in the United States illegally. When a BNE official contacted the INS, it refused to release any information over the phone.

Because Orekoya had lost his green card, he could not produce any legal documents proving his immigration status. As a result, on July 24, 1989, BNE temporarily suspended Orekoya, with pay. He went to the Boston INS office and returned to BNE the next day with a stamp on his passport proving eligibility. He was immediately given back his position.

B. Procedural History

Orekoya filed a complaint against USSS and Mooney. He claimed that he had been the victim of discrimination and alleged violations of the Fourth, Fifth, and Ninth Amendments, 42 U.S.C. §§ 1981, 1983, and the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I (2003). He also claimed that the USSS had violated the Privacy Act, 5 U.S.C. § 552a, and the Financial Privacy Act, 12 U.S.C. § 3417 (2000). Finally, he alleged counts of slander and abuse of process against Mooney.[2]

Orekoya filed his first complaint in 1992. He filed an amended complaint in early 1996. Since that time, for a variety of reasons including illnesses and recusals, the case has been heard by no less than four federal district court judges. It has been over a decade since the first complaint was filed. We briefly navigate the contours of the procedural history, setting aside the niceties until they are relevant to the discussion.

---

[2] Orekoya did not pursue the abuse of process claim.

In a summary judgment ruling in 1997, the district court dismissed the Fourth, Fifth, and Ninth Amendment claims and the § 1983 claim. It dismissed the Fifth and Ninth Amendment claims against Mooney based on a finding that he was entitled to qualified immunity.

In 1999, the district court granted summary judgment to the defendants for any remaining Fourth, Fifth, and Ninth Amendment claims. It also dismissed the Massachusetts Civil Rights Act and slander claims. After this order, all that remained were the § 1981 claim and the Privacy Act and Financial Privacy Act claims. The court also made clear that the § 1981 claim could encompass discrimination based on ethnicity and ancestry, but that Orekoya could not bring a separate claim for discrimination based on national origin under Bivens.

The § 1981 claim was tried in front of a jury in March 2000. Orekoya asked that the court submit a Bivens claim for national origin discrimination to the jury as well as the § 1981 claim for discrimination for race or ethnicity. The request was denied. On March 22, 2000, the jury found for the defendants.

On March 24, 2000 the district court held a bench trial. On February 15, 2002, the district court found for the defendants on the Privacy Act claim.[1] It found that Walsh's disclosure to BNE

---

[1] Orekoya voluntarily dismissed the Financial Privacy Act claim after trial.

did not violate the Act because it did not involve the USSS's own records system, which does not maintain records regarding citizenship, and because Orekoya did not prove that he suffered adverse effects. It found that the Privacy Act did not allow recovery for emotional damages or other non-quantifiable injuries, and that in any case Orekoya had not proven emotional distress.

Plaintiff timely appealed both the refusal of the <u>Bivens</u> jury instruction and the district court's Privacy Act claims.

## II. Discussion

## A. The Privacy Act, 5 U.S.C. § 552a(b)

When reviewing the decisions of the district court in a bench trial, we review the court's legal determinations de novo and its factual findings for clear error. <u>N.E. Drilling</u> v. <u>Inner Space Servs., Inc.</u>, 243 F.3d 25, 37 (1st Cir. 2001).

In the Privacy Act of 1974, Congress imposed restrictions on the ability of government agencies to disclose certain information on individuals which they had maintained in a system of records. <u>See</u> 5 U.S.C. § 552a(b). Since then, Congress has amended the statute several times, most recently in 1999, taking further incremental steps to protect the privacy of individuals. This court has had very few occasions to interpret or apply the Act. <u>See, e.g.</u>, <u>Fed. Labor Relations Auth.</u> v. <u>U.S. Dep't of the Navy</u>, 941 F.2d 49 (1st Cir. 1991); <u>Beaulieu</u> v. <u>IRS</u>, 865 F.2d 1351 (1st Cir. 1989); <u>Usher</u> v. <u>Sec'y of HHS</u>, 721 F.2d 854 (1st Cir. 1983).

> At issue here is the bar on unauthorized disclosures:
>
> > No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains . . . .

5 U.S.C. § 552a(b). If an agency, acting intentionally or willfully, violates this command "in such a way as to have an adverse effect on an individual," Congress has authorized the filing of a civil action for damages by the affected individual. Id. § 552a(g)(1). Both "actual damages sustained by the individual" and statutory minimum damages of $1,000 are available, along with attorney's fees. Id. § 522a(g)(4).

> In sum, the key elements of a cause of action under the Privacy Act for damages for disclosure are:

> (1)  agency disclosure (by any means of communication)
> (2)  to an individual or another agency
> (3)  of a "record" contained "in a system of records"
> (4)  which is unauthorized by the individual, and
> (5)  which is not within an exception
> (6)  and has an "adverse effect" on the individual (a requirement which contains two components: (i) an adverse effect standing component (ii) a causal nexus between the disclosure and the adverse effect)
> (7)  and that the agency action be in a manner which was "intentional" or "willful," which means proof somewhat greater than gross negligence.

See 5 U.S.C. § 552a; Quinn v. Stone, 978 F.2d 126, 131 (3d Cir. 1992); Waters v. Thornburgh, 888 F.2d 870, 872 (D.C. Cir. 1989). The Privacy Act prohibits more than dissemination of records themselves, but also "nonconsensual disclosure of any

-9-

information that has been retrieved from a protected record."
Bartel v. FAA, 725 F.2d 1403, 1408 (D.C. Cir. 1984).[2]

The district court entered summary judgment on multiple grounds on the two sets of alleged violations -- the 1989 actions of Agent Walsh and the 1990 actions of Agent Mooney.  We discuss only three of those grounds.  The district court held (1) that unauthorized disclosure from one agency's system of records by another agency to a third party is not a violation of the Act; (2) that mental or emotional distress are not encompassed within the phrase "actual damages" under the Act; and (3) that plaintiff's proof failed to permit a reasonable factfinder to find any compensable emotional distress caused by the alleged violations. We disagree with the first two grounds.  But we do agree as to the third ground and so ultimately affirm the summary judgment.

1.  Disclosure and System of Records

The district dismissed Orekoya's claims concerning Agent Walsh's disclosure on the basis that USSS did not maintain a system of records concerning immigration status and Walsh therefore did not rely on any USSS record about plaintiff's citizenship.  The plaintiff alleges that Agent Walsh called the INS and obtained

---

[2] For a disclosure to be a violation of the Act, the information must have been obtained from a protected record; disclosing information that happens to be contained in a protected record is not covered by the Privacy Act if the information is obtained independently.  Olberding v. United States Dep't of Def., 709 F.2d 621, 622 (8th Cir. 1983).

-10-

information from the INS system of records, and then disclosed the information to BNE, Orekoya's employer, without Orekoya's consent. Similarly, as to USSS Agent Mooney, the court concluded that if he disclosed to BNE information from FBI files about Orekoya's prior arrest for unarmed robbery, that was not an actionable disclosure.

We hold that the unauthorized disclosure by one agency of protected information obtained from a record in another agency's system is a prohibited disclosure under the Act, unless the disclosure falls within the statutory exceptions. We stress that the issue is not the disclosure by one agency to another, but the disclosure by the second agency to a member of the public. We reject the district court's reading on the grounds that it is contrary to the plain language of § 552a(b) and would defeat the purposes of the Act. The statute says that no agency shall disclose any record which is contained in "a system of records." 5 U.S.C. § 552a(b) (emphasis added). A "system of records" is defined as a group of any records "under the control of any agency." Id. § 552a(a)(5). The statute also prohibits unauthorized disclosure "to another agency." Id. The language does not support the view that an agency may immunize itself from liability by obtaining information from a different agency's system of records and then saying its further unauthorized disclosure is protected because its own system of records was not the original source.

-11-

Such a reading would create a tremendous loophole in privacy protection, one surely not intended by Congress.

Even if the initial disclosure by an agency from its own system of records (here the INS) to another agency (here the USSS) were within one of the exceptions, see, e.g., § 552a(b)(7) (permitting disclosures between agencies "for a civil or criminal law enforcement activity" upon a written request), that would not permit the recipient agency to then make an unauthorized disclosure to a third party if the latter disclosure did not itself fall within an exception. The Ninth Circuit reached a similar conclusion in Wilborn v. Department of Health & Human Services, 49 F.3d 597, 601 (9th Cir. 1994).

2. Availability of Emotional Distress Damages Under the Privacy Act

The district court ruled as a matter of law that no recovery is available under the Privacy Act for emotional distress damages. The question presented is not whether out-of-pocket pecuniary costs occasioned by emotional distress, such as payments to therapists for treatment, are "actual damages"; they surely are. The government agrees that such losses are "actual damages" within the meaning of the statute, but argues that damages are restricted to only such out-of-pocket expenses.

What appears to be a simple question is instead a complicated series of questions. The Privacy Act provides:

> (4) In any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section in which the court determines that the agency acted in a manner which was intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of --
>> (A) actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000; and
>> (B) the costs of the action together with reasonable attorney fees as determined by the court.

5 U.S.C. § 552a(g)(4). This in turn raises a series of questions concerned with the relationship between the statutory requirement that there be "an adverse effect on an individual," id. § 552a(g)(1)(D), the "actual damages" requirement, id. § 552a(g)(4)(A), and the $1,000 statutory damages provision for a person "entitled to recovery," id.

First is the question of whether an individual must show merely an adverse effect to receive $1,000 in statutory damages, or whether he must also show actual damages in order to receive even statutory damages. The statutory "adverse effect" requirement, id. § 552a(g)(1)(D), is generally viewed as a standing requirement and a causation requirement which enables an individual to bring a civil action to enforce civil remedies. Quinn, 978 F.2d at 135. If showing an adverse effect is sufficient to get $1,000 statutory damages, then the initial question is whether provable emotional distress constitutes an adverse effect. Five circuits have held that an allegation of emotional distress was sufficient to show

-13-

adverse effect, and that a plaintiff asserting emotional distress could recover at least $1,000: the Third Circuit, see id. at 135; the Fifth Circuit, Johnson v. IRS, 700 F.2d 971, 976-77 (5th Cir. 1983); the Tenth Circuit, see Parks v. IRS, 618 F.2d 677, 682-83 (10th Cir. 1980); the Eleventh Circuit, see Fitzpatrick v. IRS, 665 F.2d 327, 331 & n.7 (11th Cir. 1982); and the D.C. Circuit, see Albright v. United States, 732 F.2d 181, 186 (D.C. Cir. 1984). Whether under "actual damages" the plaintiff could recover more than statutory damages is another question for this group of courts. One circuit, the Fourth, over a dissent, has held that an individual must suffer "actual damages" in order to be considered "a person entitled to recovery" and thus eligible for the statutory minimum damages of $1,000. Doe v. Chao, 306 F.3d 170, 177 (4th Cir. 2002). That court agreed that an adverse effect may be shown by emotional distress, but disagreed that an adverse effect is sufficient to obtain emotional distress statutory damages, while acknowledging the issue to be close.[3]  Id. at 177-79 & 180 n.6.

Inherent in these cases is an analysis that Congress would not have granted standing to pursue an action for civil remedies to those who suffered an adverse effect caused by an intentional or willful violation and then afforded no remedy at all for the adverse effect. Such a result, the reasoning goes, would be belied

---

[3] The Sixth Circuit in Hudson v. Reno, 130 F.3d 1193, 1207 & n.11 (6th Cir. 1997), addressed only the actual damages issue, not the statutory damages issue.

by the language that "in no case shall a person entitled to recovery receive less than the sum of $1000." 5 U.S.C. § 552a(g)(4)(A). Such a reading is also supported by the legislative history, which shows that the phrase "adverse effect" is drawn from the remedial section of the House bill and is consonant with the remedial section of the Senate bill, which refers to "aggrieved persons." See Parks, 618 F.2d at 682-83 & n.2.

As explained by the dissent in Doe, "the meaning of 'adverse effect' in subsection(g)(1)(D) is both distinct from and broader than the meaning of 'actual damages' in subsection (g)(4)(A)." 306 F.3d at 186 (Michael, J., concurring in part and dissenting in part). This is also how the Third Circuit has interpreted the statute. Quinn, 978 F.2d at 135 n.15. As a result, proof that there is an adverse effect may not be sufficient to prove actual damages.

We agree with the dissent in Doe that the most natural and reasonable reading of the statute is that statutory damages, if not actual damages, are available to individuals who suffer adverse effects from intentional and willful violations of the act and that provable emotional distress may constitute an adverse effect. The statute provides that a "person entitled to recovery" shall receive at least statutory damages of $1,000. 5 U.S.C. § 552a(g)(4)(A). We join the rule adopted by the majority of circuits that have

addressed this issue,[4] as described by the dissent in <u>Doe</u>, 306 F.3d at 189. That is the interpretation adopted by OMB, the agency responsible for implementing the Act. <u>See</u> OMB Privacy Act Guidelines, 40 Fed. Reg. 28,949, 28,970 (July 9, 1975). It is also the most consistent with the legislative history described in <u>Parks</u>, 618 F.2d at 682-83. Indeed, even the seminal Eleventh Circuit case which rejected emotional distress damages as actual damages found that emotional distress is an adverse effect for which statutory damages are available. <u>Fitzpatrick</u>, 665 F.2d at 331 & n.7.

This, though, leaves the question of whether non-pecuniary emotional distress damages of more than $1,000 may be recovered as actual damages. We describe but do not resolve the question, which we consider to be a much closer one. Here, too, the circuits disagree. The Fifth Circuit has held that emotional distress damages should be included as "actual damages" under the Privacy Act. <u>See</u> <u>Johnson</u>, 700 F.2d at 977. The Tenth Circuit has not explicitly addressed this question but has interpreted the Privacy Act as borrowing from the common law tort of invasion of privacy, where "mental distress or embarrassment would be a natural and probable consequence of such an invasion." <u>Parks</u>, 618 F.2d at 683. The Sixth and Eleventh Circuits have held that emotional

_____

[4] It is not clear from the government's brief whether it agrees with or objects to this conclusion.

-16-

distress damages are not recoverable under the Privacy Act as "actual damages." Hudson v. Reno, 130 F.3d 1193, 1207 (6th Cir. 1997); Fitzpatrick, 665 F.2d at 331. The Fourth Circuit reserved the question. Doe, 306 F.3d at 181. See generally F.Z. Lodge, Note, Damages Under The Privacy Act of 1974: Compensation and Deterrence, 52 Ford. L. Rev. 611 (1984).

The circuits which exclude emotional distress damages from "actual damages" do so on the basis that what is involved is a waiver of sovereign immunity and thus must be strictly read. "A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text and will not be implied." Lane v. Pena, 518 U.S. 187, 192 (1996) (internal citations omitted); see United States v. Nordic Vill., Inc., 503 U.S. 30, 33-34 (1992). In addition, "actual damages" does not have a generally accepted meaning of including emotional distress damages. Such damages are hard to police and may lead to broader waivers of immunity than Congress intended when it used the phrase "actual damages." These courts also rely on legislative history set forth ably in Fitzpatrick, 665 F.2d at 330-31, although other cases point to legislative history going the other way, see Johnson, 700 F.2d at 975-77; Parks, 618 F.2d at 682; see also Lodge, supra, at 623 n.76.

The reading that "actual damages" include emotional distress damages is based on several arguments, as follows.

-17-

Congress clearly waived immunity as to "actual damages" in the Privacy Act, which in turn was based in part on the Fair Credit Reporting Act (FCRA), 15 U.S.C. §§ 1681-1681t (2000), which then and since has usually been interpreted to include emotional distress damages within "actual damages."  See Cousin v. Trans Union Corp., 246 F.3d 359, 371 (5th Cir. 2001).[5]  Admittedly, the government is not the usual defendant in FCRA cases and so no issue of sovereign immunity is necessarily involved in those cases. Admittedly as well, there was not a large body of case law at the time of enactment of the Privacy Act under the FCRA.

Further, under the common law, damages for emotional distress were awardable for invasion of privacy or for public disclosure of private facts.  62A Am. Jur. 2d Privacy § 106 (2002); see Time, Inc. v. Hill, 385 U.S. 374, 386 n.9 (1967); Parks, 618 F.2d at 683; Restatement (Second) of Torts § 652H (1977).

---

[5] See also Casella v. Equifax Credit Info. Servs., 56 F.3d 469, 474-75 (2d Cir. 1995); Guimond v. Trans Union Credit Info. Co., 45 F.3d 1329, 1333 (9th Cir. 1995); Bryant v. TRW, Inc., 689 F.2d 72, 79 (6th Cir. 1982); Millstone v. O'Hanlon Reports, Inc., 528 F.2d 829, 834-35 (8th Cir. 1976).  Similarly, as noted in Johnson, 700 F.2d at 983-84, the term "actual damages" in the Fair Housing Act (FHA), 42 U.S.C. § 3612(c), has been interpreted by some courts, before enactment of the Privacy Act and since, to include damages for emotional distress as well as out-of-pocket loss.  See Banai v. Secretary, 102 F.3d 1203, 1207 (11th Cir. 1997); United States v. Balistrieri, 981 F.2d 916, 928 (7th Cir. 1992); United States v. Long, 537 F.2d 1151, 1154 (4th Cir. 1976); Smith v. Anchor Bldg. Corp., 536 F.2d 231, 236 (8th Cir. 1976); Steele v. Title Realty Co., 478 F.2d 380, 384 (10th Cir. 1973).

Finally, in civil rights actions under 42 U.S.C. § 1983, the Supreme Court has permitted the award of emotional distress damages, Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 307-08 (1986), albeit subject to standards of proof, Carey v. Piphus, 435 U.S. 247, 264 n.20 (1978). As to the sensible limits point, "Distress is a personal injury familiar to the law, customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff." Id. at 263-64.

This circuit has no informative precedent under the Privacy Act or the FCRA. One case includes emotional distress damages within the meaning of the statutory term "actual damages." In Fleet Mortgage Group, Inc. v. Kaneb, 196 F.3d 265 (1st Cir. 1999), we interpreted damages under 11 U.S.C. § 362(h) (2000) of the Bankruptcy Code, which addresses the willful violation of a stay, as encompassing emotional distress damages. Id. at 269. But again, that case did not involve waiver of the federal government's immunity.

Under any of the above formulations, the plaintiff would have to show a causal connection between the Privacy Act violation and the emotional distress damages. And here we have the trial judge's fully warranted holding, after trial, that plaintiff failed to meet his burden on causation.

Orekoya has not appealed from the district court's determination that there was no causal relationship between the

-19-

termination of his employment and the defendants' actions.  Thus, his only damages, if any, are to compensate for emotional distress. Orekoya said that he sought mental health counseling as a result of being upset when he was escorted from BNE when he could not produce immigration papers showing he was validly in the country.  To support Orekoya's claim of emotional distress, a psychiatrist testified that he suffered from depression.

The district court had before it a decade of accumulated record, including testimony from the § 1981 jury trial.  It found that Orekoya's claim of emotional distress "lacks credibility." The psychiatrist who testified had examined Orekoya during three one-hour sessions and had not independently verified his statements.  There was no external evidence of Orekoya's distress; as the district court found, "During the first semester following his suspension, Orekoya performed exceptionally in all his classes at Northeastern University," and he had a successful interview at the New England Banking Institute, which led to his admission there, two months after his suspension at BNE.

Even if Orekoya could have proven emotional distress, there was nothing but speculation to link it to a Privacy Act violation.  Orekoya had independent reasons to be distressed: he had been accused of rape, which led to BNE suspending him from his job; and a massive layoff at BNE caused him to lose that job.

We find no clear error in the district court's holding that Orekoya neither demonstrated emotional distress nor showed that it was caused by any Privacy Act violation.

B. <u>Bivens Jury Instruction Issue</u>

Orekoya's request for a <u>Bivens</u> jury instruction was, in essence, a request to reconsider the legal ruling of a prior judge in the proceeding. We review such requests for abuse of discretion. <u>Ellis</u> v. <u>United States</u>, 313 F.3d 636, 648 (1st Cir. 2002).

Orekoya's § 1981 claim went to the jury, which returned a verdict against him. The instruction given was:

> To establish this case, Mr. Orekoya must persuade you by a preponderance of the evidence of four things:
> First, that he is a member of a distinct racial or ethnic group;
> Second, that Agent Mooney discriminated against him because of his race or ethnicity;
> Third, that he was deprived of the full and equal benefit of the laws as enjoyed by white citizens; and,
> Fourth, that he suffered damages as a result of this discrimination.
> That Mr. Orekoya, as a black Nigerian, is a member of a distinct racial group is not a matter of dispute. The real issue in this case is whether the actions taken by Agent Mooney involving Mr. Orekoya, such as you find them, were motivated by a racially discriminatory purpose; that is, did Mr. Agent Mooney intentionally and purposefully discriminate against Mr. Orekoya because he was a black person from Nigeria, or were his actions motivated by some legitimate race-neutral reason.

This instruction itself was subject to no objection.

Orekoya's argument, which was presented by post-instruction objection and pre-instruction request,[6] is that he was entitled to an additional instruction on the ground that a jury could perfectly well find he had not been discriminated against because he was black but that would not dispose of the issue of whether he had been discriminated against because he was Nigerian. This is a serious error, he says, because his entire case was geared to showing Agent Mooney's excessive zeal in targeting and harassing Nigerians because of their nationality, not their race. The government's response is that there was no longer any <u>Bivens</u> issue (if a <u>Bivens</u> claim was stated at all -- an issue we do not reach) to submit to the jury because Judge Young had dismissed the <u>Bivens</u> claim on qualified immunity grounds in 1997 and Orekoya thereafter did not pursue the issue. Orekoya demurs that Judge Young dismissed only the Fifth Amendment due process claims and not the Fifth Amendment equal protection claims.

While it is true that the discussion in the court's order says Orekoya argued his Fifth Amendment due process rights had been violated, the order quite clearly dismisses all Fifth Amendment claims in Counts I, II, and IV. Those counts are brought,

---

[6] His requested instruction was: "If, but only if, you find that the actions of the defendant were based on national origin alone, and were not based on consideration of the plaintiff's race, then you must consider the plaintiff's claims under the Fifth Amendment to the United States Constitution." The requested instruction went on to describe the Fifth Amendment and the <u>Bivens</u> doctrine.

respectively, under the United States Constitution, 42 U.S.C. § 1983, and the Massachusetts Civil Rights Act. Moreover, defendant Mooney had moved to dismiss on qualified immunity grounds all constitutional claims asserted. Both parties discussed the equal protection aspects of the constitutional claim in their summary judgment briefs. Judge Young's omission of a discussion of the equal protection claims did not mean the dismissal did not encompass those claims.

Orekoya next erroneously argues that Judge Young could not have granted qualified immunity because "national origin discrimination precludes the availability of qualified immunity as a defense," citing to DiMarco-Zappa v. Cabanillas, 238 F.3d 25, 31, 37 (1st Cir. 2001). The assertion is flatly wrong. DiMarco applied the usual rules of qualified immunity and concluded, on the facts there, that immunity was not available. There is no per se rule that national origin discrimination is exempt from qualified immunity analysis.

Further, if plaintiff thought the immunity order ambiguous, he had some obligation to resolve the ambiguity by straightforwardly presenting it by motion for reconsideration. The record is bare. We do not, as does plaintiff, read Judge Lindsay's colloquy with counsel on May 13, 1999 as establishing that there was a live Bivens claim under the equal protection prong of the Fifth Amendment. To the contrary, Judge Lindsay, in discussing the

-23-

§ 1981 claim which would go to the jury, seemed to say that in addition to the qualified immunity defense, no <u>Bivens</u> claim was stated on the merits because a remedy existed under § 1981.

At most there is a belated request to the trial judge, Judge Stearns, for a <u>Bivens</u> jury instruction. In these circumstances the decision by the trial judge not to permit rebirth of a theory long buried was not an abuse of discretion.

That trial judge added another reason for rejecting the proposed instruction: it was not close to affecting the outcome. If the jury returned a verdict against plaintiff on the instructions given, plaintiff surely would have lost as well on the instruction he requested. The instruction given required a finding of discrimination against Orekoya as "a black person from Nigeria" and that the discrimination be based on his "race or ethnicity." We agree that any purported error in failing to give the additional requested instruction was harmless.

C. <u>Conclusion</u>

The judgment for defendants is **<u>affirmed</u>**.


**(Concurring opinion follows.)**

**CAMPBELL, <u>Senior Circuit Judge</u> (concurring)**.  I wish only to emphasize the panel's express holding in its preceding opinion that it does <u>not</u> resolve (and I would understand, does not signal any preference relative to) the question of whether non-pecuniary emotional distress damages of more than $1,000 may be recovered under the rubric of "actual damages."  Whatever the arguments favoring such damages, as set out in the court's opinion, one must also wrestle with the difficult question whether and where Congress has provided "an unequivocal textual waiver of the Government's immunity," necessary before such damages can be recognized and allowed by the courts.  <u>United States</u> v. <u>Nordic Village, Inc.</u>, 503 U.S. 30, 39 (1992); <u>see also</u> <u>Lane</u> v. <u>Pena</u>, 518 U.S. 187, 192 (1996).  This issue awaits another day.